The first case, InRe G-I Holdings, Inc., and Mr. Hoffman. Good morning, Your Honor. Did either of you want to reserve rebuttal time? Yes, Ms. Bloom-Katz will reserve two minutes. Okay. You may proceed. May it please the Court, my name is Stephen Hoffman of the firm of Will Kostander, attorneys for Quigley Company, Inc., one of the appellants. My co-counsel, Rachel Bloom-Katz, is from the firm of Jones Day and represents U.S. Gypsum. I'm going to be arguing for seven minutes and will address the issue of whether the appellants waive their right to sue G-I by agreeing to forego claims for contribution and indemnity arising out of asbestos personal injury claims. Ms. Bloom-Katz will address the issue of whether the producer agreement delegated to the CCR, the exclusive authority to bring claims against contracting parties, and failure to pay their agreed percentage of settlements. The appellants and the appellees and approximately 18 other companies, who were defendants in thousands of personal injury asbestos cases. Mr. Hoffman, you don't have that much time. We know the facts pretty well, so why don't you maybe get right into your argument. Well, we submit, Your Honor, that the district court was wrong in holding that the appellants waived their right to sue G-I for breach of contract by agreeing to forego claims for contribution and indemnity in personal injury cases. And the reason for that is that in order to reach that conclusion, the district court was required to disregard the express terms of the governing agreement the producer agreement. The first point we want to make is that claims for contribution and indemnity arising out of asbestos related cases is defined in the producer agreement. Asbestos related cases are specifically defined as lawsuits against the members for personal injuries arising out of exposure to asbestos. And the claims in this case are not claims over arising out of personal injury claims. They're claims for breach of contract because G-I failed to pay its allocated shares. That's your key point, correct? That is our key point. That is our key point, that by definition these claims are not the ones that are referred to in the agreement to forego claims for contribution and indemnity. You seem to be relying heavily on a sentence in Article 10, if I read the briefs correctly. That as well, Your Honor. But the first point related specifically to the definition of asbestos related claims in Section 1.2 of the producer agreement. They're defined as claims against one of the members for personal injuries arising out of exposure to asbestos. The second point is that in addition to the fact that the agreement to forego claims doesn't relate to claims for breach of contract is the fact that Section 10, as Your Honor pointed out, expressly reserves the rights of the members of the CCR, namely our clients Quigley and U.S. Gibson, to bring claims for breach of contract. G.I. Holdings argues, though, when you're talking about Section 10, Roman numeral 10, that the title, third-party rights, needs to be taken into consideration in construing that section. Well, we don't deny that you take a title into consideration, but a title can't obliterate the express words of the text. And there are three sentences in Paragraph 10. The first indicates who has the rights. The second says that no one other than the center or the producers or the insurers have the rights. And if the third sentence were meant only to preserve, to make it clear there were no third-party rights, it would be completely redundant to the second sentence. We believe there's no – there would be no reason to have inserted that in the agreement unless the intention were to make it absolutely clear that the producers retain the right to sue for breach of contract. All right. You talked about waiver, but your opposition talks about what this really was with delegation. It wasn't waiver. That this agreement has to be construed as to whether or not your client and other producers delegated their rights to CCR. Well, they certainly delegated to CCR the right to bring an accelerated ADR to collect from the members so that they could make payments to plaintiffs to settle personal injury cases. But there's nowhere in the agreement that you can find an exclusive delegation of authority to the CCR to bring suits. Ms. Bloomcast will address that in more detail. But they rely on the fact that there's a delegation of a right to bring an accelerated ADR to the CCR and that there's no delegation to the members of the right to sue. But every contracting party has an inherent right as a matter of law to sue another party for breach of contract. Under the terms of this agreement, doesn't your interpretation lead to the real possibility of a double recovery? No, I don't believe so, Your Honor. If the CCR brought a case and pursued it to judgment. Which they did here. They brought a claim. They filed a proof of claim in bankruptcy. And settled it. And the settlement expressly excluded any indication that it expressly said that it didn't settle our claims. And also it went further and said if they have to pay your claims that they'll indemnify. Exactly. Now, it seems that the fact that they had to give an indemnification might be something that G.I. Holdings could utilize to argue that the plan was only for one recovery here. They certainly tried when they settled the CCR case to do that. But our client vociferously objected. And we've not only objected to the approval of the settlement agreement, but we objected to the confirmation of the plan. And the record reflects that to allow both to be approved, they agreed that the settlement would not settle our claims. And the court's order expressly says that. And what did the bankruptcy court and the district court say about this particular point, though? The bankruptcy court agreed that there was a possibility of double recovery. Never explained how that jived with the fact that the order expressly excluded the settlement of our claims, and the district court did not rule on it. The difficulty that I'm having with your argument is that we have a provision in Article 14.3 that begins by saying that all disputes concerning the validity, interpretation, and application of the agreement and all disputes concerning issues within the scope of the agreement shall be resolved through alternative dispute resolution. So it seems as though the parties have, while recognizing the rights of producing employers who are party to this agreement, they've delegated the enforcement of the agreement to the arbitration process. It's a very broad, all-encompassing kind of definition, all disputes concerning the validity, interpretation, and application. How do you reconcile that with your claim that Article 10 would allow you to directly sue? I think that the provision Your Honor is referring to actually supports our argument. There are two parts to that, to 14, that address ADR. Three and four. The first talks about all disputes, whether they're between members, regarding the CCR, are to be decided by alternative dispute resolution. The part that delegates to the CCR a limited authority, permissive authority, to bring in ADR to collect money is only one aspect of that. We believe that the provision Your Honor referred to is designed to recognize the fact that there are going to be litigation among members, and those two are supposed to be in ADR. It's a separate provision. I don't believe it's intended to be coextensive with the delegation to the CCR of the limited right to sue. All right. Mr. Hoffman, we'll hear from your co-cop. Thank you, Your Honor. Ms. Blumkatz. Thank you, Your Honors. May it please the Court, Rachel Blumkatz on behalf of United States Gypsum Company, or USG for short. As I mentioned, I'd like to reserve two minutes for rebuttal. That request will be granted. Thank you. I'd like to pick up on your question, Judge Fischer, as to whether there was a delegation or an exclusive delegation to the CCR of the right to bring a collection action. And respectfully, that exclusive delegation is just not borne out by the text of this agreement. Your Honors have already mentioned Section 10, which Mr. Hoffman spoke of, which expressly reserves the rights of the parties like USG and Quigley to bring breach of contract actions. Now, they may need to bring them as an ADR proceeding, as Judge Mariani pointed out, but they still reserve the right to bring that claim. There's a second part of the agreement that I – But it doesn't specify the kind of claim. You're just saying it's a general reservation. Well, Section 10 says that all rights of action for any breach of this agreement are hereby reserved. That's on page 727 of the appendix, if you'd like to look at that language. I certainly agree, Your Honors, that Section 10 doesn't create any rights that don't exist. But as Mr. Hoffman mentioned, you don't need a specific part of a contract to say you have the right to sue for its breach. That's inherent under Delaware contract law, that if the party's breached and you're harmed, you can sue. I'd also, if I may, like to point to the language of Section 14, Paragraph 4, which is that part that says that the CCR may institute an ADR on behalf of its members to collect from a non-breaching member. Now, notably, it does not make that a remedy exclusive, and that's really in sharp contrast to other parts of the producer agreements where the parties are very clear when they're giving the CCR the exclusive authority. So if I may turn your attention, for example – Certainly, they have the option to bring the suit, and that permissive nature that, Judge Zureka, you're mentioning, is a reason that the parties wouldn't have wanted to make the CCR's authority exclusive. The CCR, for example, may not sue. Maybe there's not enough money at stake or not enough parties involved, but any of the other members that had to cover for a breaching member's share, they wouldn't want to be left holding the tab, and instead they relied on the fact that, again, their rights to bring a breach of contract claim were hereby reserved and that there was no exclusive delegation to the CCR. How much authority has been given to the CCR here? The way I hear your argument, apparently there are limitations on the authority, but I'm not sure where with some of the broad delegations of authority you find in the preliminary provisions of the agreement. Well, Your Honor, the agreement is very clear when it gives the CCR exclusive authority over things. For example, if you look at Section 4, Paragraph 1, the parties are very clear that the CCR acts as the sole agent of the members in dealing with these tens of thousands of personal injury asbestos cases brought by plaintiffs, and that section goes on to explain that the CCR has the exclusive authority and discretion to enter into settlement agreements in those personal injury cases. But when we get to the CCR's collection action, there's no such language like that sole authority or that exclusive delegation. So we know that the parties knew how to make the CCR's authority exclusive when it wanted to, and it didn't here. And to address directly, Your Honor, the question about those preliminary statements at the beginning of the agreement, those whereas clauses specifically state that the parties intended to resolve cross and counter claims among the parties, not all litigation. The lower courts, I think, very much overstated the purpose of the agreement, trying to get away from this very plain text by saying that the agreement was to eliminate all internecine litigation. Well, that's just an overstatement. Again, the best way to understand the purpose of the parties is to look at the text of the agreement itself. Those whereas clauses that you mentioned at the beginning explain that the parties want to get rid of these suits for contribution and indemnity. They don't want to be arguing in every single personal injury action how much each defendant is owed to each plaintiff. One of your arguments in your brief, and I think there's an indication that it wasn't raised below, is that there's an ambiguity here that precluded summary judgment. Is that a significant argument in your perspective here, or is that something that you think weighs less heavily in our discussion of what should happen here? It is not a significant argument, Your Honor. It's just an articulation of the standard of review on summary judgment. This Court has said that summary judgment is improper in contract interpretation action if there are two plausible readings of the statutes. That's that GMC case that is cited in our briefs, Your Honor. Certainly, I think that the reasonable, clear interpretation of this agreement is according to its plain text, which under Section 10 uses those strong action words and hereby reserving all rights of action for any breach of the agreement to participating producers, such as the CCR and Quigley. So I don't believe that that specific portion is dispositive of this case. I would like, please, Your Honor. Again, I'm looking at Article 14, Section 1, and it indicates that there's essentially a waiver of contribution or indemnity against participating producers. How do we ignore that in light of the overall text of the agreement that seems to be one that was designed to forego or eliminate the kinds of claims that frankly would include the kind of claim you're bringing here? I think it's actually a very different type of claim, Your Honor. Going to the text of Section 14, Paragraph 1, to which you're referring, explains that the parties waived these claims for contribution and indemnity in the context of asbestos-related claims. And as Mr. Hoffman explained, asbestos-related claims has a very specific meaning under this producer agreement, and that's defined right at the beginning of the agreement in Section 1, Paragraph 2. So you waive claims for contribution and indemnity in each of those personal injury cases, but that's very different than waiving your basic breach of contract action if the parties don't follow the formula. I like to think of it, for example, as saying a claim for contribution and indemnity would eviscerate the formula rather than follow it. But the contributions that you're seeking by your breach of contract action are actually contributions to pay asbestos-related claims, are they not? Well, they're to pay the share that we had to cover of the allocation formula on G1's behalf. But it's certainly not. I think the parties are very clear that they wanted to not be fighting in every single personal injury case, but they still retain the right to bring a breach of contract action lest any party not pay their share. Okay, Ms. Blumkatz, we'll have you back on rebuttal. Thank you. Thank you. Mr. Rossman. Thank you, Your Honors. I'd like to start just where Ms. Blumkatz left it with Judge Mariani's question, which is if these collection actions against former members are what they obviously are, a means of funding the payment of the asbestos liabilities that they have collectively organized to resolve, then how would you have a scheme, why would you have a scheme that prohibits member-on-member litigation with respect to contribution and indemnity claims, and yet allows a massive backdoor for the members to challenge the portion of the asbestos liability? Yes, but this kind of claim wouldn't be used to fund the payment of the asbestos claims. It's basically an attempt by the producers to get the money back that they had to pay for your client's share. The producers had to pay, to be precise, Judge Fischer, that the producers had to pay to the CCR. Correct. So that the CCR could administer the scheme, which included the payment of asbestos-related liabilities. So I think Judge Mariani is right, and I think this was pointed out in the Bankruptcy Court's opinion, that the reading that is provided by the former members here of 14.1, that contribution and indemnity claims don't, that waiver, that bar in contribution and indemnity claims, does not interfere with their claim here. That doesn't make any sense at all in the overall context of this scheme. Why would you prevent them from suing each other when they can sue each other indirectly by challenging the apportionment scheme? And to bring us back to a question that was raised earlier, would there be a potential for duplicative recoveries in this case? There's no question about it. I believe it's conceded in the briefs that barring either a judicial fix, or what we have here is the extra-contractual indemnity obligation that Your Honor pointed to that was reached in the settlement, a fail-safe in the settlement. Barring those two fixes, you would have a contract that provided for double recoveries if you were to believe the appellant's construction of the contract. We think that points out quite clearly that the appellant's construction is wrong. It would make no sense at all to create one integrated, collective claims resolution mechanism that puts 21 companies together and proposes with the CCR the sole discretion as sole agent to administer this collective scheme, including, okay, as Section 6 and Section 9 of the contract points out, which is very important here, the CCR has the right, CCR shall administer the allocation formula, so it decides how much the members have to pay. That's a complicated formula in Section A. Why shouldn't it enforce it? It explicitly has the right to. Sorry, go ahead, sir. What is the meaning, then, of the exclusion in the settlement? What was all that about? It seems to me it's been ignored, and I don't know that the Bankruptcy Court or the District Court properly addressed this. But what was its purpose, then? It was a carve-out. It was an expedient, Your Honor, to allow for the prompt confirmation of a bankruptcy plan without right then and there having the Bankruptcy Court extinguish the rights of the former CCR members to try to pursue their claims for whatever they're worth. And, frankly, this circuit reflects the confidence that G1 and the CCR had,  that they're absolutely right in their interpretation of the contract, and the former members' claims were not claims that had any merit. You mean all it did was sort of put it on the shelf, saying there's going to be no decision has been made about whether there's a right here to sue? That's right. What the settlement did was it provided a carve-out that said approval of the settlement between CCR and G1 itself, just that settlement approval under Bankruptcy Code Section 9019, Bankruptcy Rules 9019, does not extinguish whatever claims they may have, if any. It says if any in the carve-out, okay? And subsequent to that, the Bankruptcy Court heard and decided the summary judgment motion and decided in favor of G1, and, of course, that was the subject of this appeal. How do you explain the third sentence in Section 10? The third section in Sentence 10 is consistent with the first two sentences. It clarifies those first two sentences. It's no more ambiguous than using the word cease and desist. What it means is there are third parties. If you look at that provision as a whole, and I think it's worth looking at, it is clearly a no-intended third-party beneficiary provision. Bankruptcy Court and District Court recognize it as such. It has three sentences in it. The three sentences work together, and what they say is parties, non-parties to the contract don't get to participate. The parties get to participate. You'll notice that the center is the first party, identified as having rights reserved under the agreement. So to say that no one else has rights and to say that the rights are reserved to the parties to the agreement are perfectly consistent, and it's a clarifying sentence. And I might add, Judge Fischer, it makes clear that the CCR, CCR of course is the creation of this agreement, that the CCR is being given rights under the agreement, even though the CCR itself is not a signatory per se. But the reservation of rights not only to the center, but to signatories would suggest that they would have some independent ability to enforce the agreement outside of whatever action or authority has been conferred on the CCR, doesn't it? Well, Your Honor, it's conceded in the briefs. It was conceded at the podium by the appellants that Section 10 doesn't create any rights. So Section 10 merely recites that whatever rights there are elsewhere in the agreement are rights that only belong to the parties. So you've got to look at the specific provisions of the agreement to ascertain what the rights of those parties are. In Section 14.4, we believe it's clear there was an express delegation of authority to the CCR. We think the only way that you can read that provision and make any sense of it is if the CCR is the only party that would have the ability to bring nonpayment claims against members. And that is consistent with Section 4, which appoints CCR a sole agent, consistent with Section 6 and 9, which allows them to administer the scheme for allocation of liabilities, and frankly is coextensive with what Ms. Blomkat said, you know, let's look to the whereas clause, let's look to the beginning of the agreement to see the scope of the agreement. The scope of the agreement is set out in the very first clause, is coextensive with the delegation of sole agency in Section 4, includes administering payment. Yes, sir. And what of the use of the permissive may in accordance with the appellant's argument in 14.4? The appellant's argument means that the CCR may or may not enforce the rights of the producing parties whose rights I understand your position to be are going to be protected and vindicated by the CCR. I think Judge Sirica began answering that question quite rightly, which is the may is the repose of discretion in the CCR, and it's a very important one because it encompasses the situation that we have here. Not all cases have to be litigated to judgment, we hope, otherwise this would be a very busy place, this courthouse. The idea is that the CCR may bring a claim or it may settle a claim or it may choose not to bring a claim. If the CCR chooses to settle as it did here, that should be the end of the story. Do you think the CCR has a fiduciary responsibility to act on behalf of the producing employers in the circumstance where one of them hasn't paid? I certainly think the CCR has a contractual responsibility to attend to the best interests of the members. The CCR did. The CCR brought a claim, the CCR litigated the claim, the CCR ultimately settled that claim, and it would be a strange contract construction if you reposed in the CCR the ability to bring those claims on an expedited basis where members are stripped of defenses and then gave all the other 20 members the ability to bring their own individual duplicative claims. And I might add, Your Honor, it's not just in the case of settlement. If the CCR, if you imagine the example where the CCR litigated the claim to conclusion and there was an arbitral award and it was confirmed in a court in a judgment, the other 20 members under the construction of the appellants would have the right to bring their own claims anyway. So you'd be creating a contract that subjects anyone to 20 appeals of any litigated judgment, and I don't think that would make any sense as a reading of this construction. The Delaware Supreme Court has made it clear. You've got to read the entire contract as an integrated scheme, and I think it's quite clear with the express delegation of authority to the CCR to administer this scheme to say that their active efforts to enforce and settle a claim can be overridden by the veto of any of the members or former members. Let me follow up on Judge Mariani's question to your opponent, and not just with the issue of what may means, but it seems that there are a lot of conflicting provisions here and ambiguities. Why should this be decided on summary judgment? Well, both parties put it on a footing of summary judgment. I understand that. If I were one of the parties, I would ask for that, too. Well, our initial contention is that the ambiguity argument is waived because it wasn't preserved below. But if we look to that, the mere fact that parties offer to the court competing constructions does not create an ambiguity. There has to be an ambiguity inherent in the contract. We don't see one. We think that the proper reading of the contract, as the Bankruptcy Court and District Court both observed, is that there was a delegation of authority to the CCR. There's no dispute here that there was a delegation of exclusive authority to the CCR. The dispute is about how broad the authority is. And I would add there's no dispute that the CCR was delegated the right to enforce. 14.4 certainly gives it the right to enforce. And there's no dispute that the claims being brought by the former members are identical to the claim that was brought by the CCR. They are all seeking recovery based on G1 shortfall of payments to the CCR. That's where the check would have gone. And the former members are only injured derivatively by virtue of the CCR not receiving that payment. Now, our principal argument is on the contract. We think the contract is perfectly clear. We don't see an ambiguity here, Judge Sirica, and we think that summary judgment should be affirmed on that basis. We think an alternative grounds for affirmance was what the Bankruptcy Court found, is that they didn't have standing to bring claims in the first place because these are claims that are in the nature of derivative claims rather than direct claims. Isn't the fact that here you have two members who are former members bringing this action, isn't the fact that the agreement contemplated former members, members who would leave, members who were terminated, or members who were terminated through bankruptcy, isn't the reading that they're asking for consistent with the reality that perhaps CCR would not be acting to recover former members' expenses, to cover your clients' expenses? I don't believe that it is, Your Honor. I think that the section of the producer agreement that deals with former members' claims, I believe is Section 3, termination of members. And if we take a look at Section 3.3 in the record of A327, the first thing it says, of course, is that a participating producer shall have none of the rights upon their exit. So one could argue that they don't even have the right to assert these breach of contract claims when they exited. But then it continues to say that the producer shall continue to have and to honor all of its obligations. So to the extent that it is bound because it gave delegation of rights to the CCR, there's no doubt at all that it continues to be bound by whatever delegation it gave. And I would argue, Your Honor, that when they exited the CCR, they had their own opportunity to negotiate with the CCR what was going to happen with the G1 claim. And if they're dissatisfied with what the CCR did, then, of course, they have whatever rights they have to bring claims against the CCR. These are not claims that properly lie against G1. The CCR is not a party to the agreement, though. The CCR is not a party, but they do have a relationship with the CCR. If they felt that they were harmed by the CCR, they could bring whatever legal claims they have against the CCR. Is there any suggestion as to those members who have left that their claims weren't paid? The claims against them, the asbestos-related claims weren't paid? Well, their contention, as I understand it, the proofs of claim is that simply that G1 left a shortfall in payment. And as a result of that shortfall, on a pro rata basis, their shares of payment to the CCR increased. So I don't know if there was a shortfall of payments that were made to asbestos claimants on behalf of those companies or not. Just so Your Honor understands the nature of the mechanism, the CCR makes the payments directly in settlement or in litigation judgments to the asbestos plaintiffs. And then the other end of the mechanism is, of course, they've got to collect. CCR's got to collect from its members. And there's some allocation formula, I believe, set forth in the appendix. Yes, there's a brutally complex allocation formula, which thankfully we don't have to go through in Appendix A. But the relevance of that, Your Honor, is that the agreement does recite expressly that the CCR shall administer that allocation formula. And I would suggest that if CCR is in charge of determining how much people owe and the CCR is the one who's given this express collection mechanism, the only sensible construction is that only the CCR can pursue those claims. Okay. Mr. Rossman, thank you. Ms. Bloom-Katz. Thank you, Your Honors. I'll start maybe with that last point that Mr. Rossman was discussing. Just because the CCR is given the ability to administer and to collect and to sort of coordinate all of these personal injury settlements brought by plaintiffs claiming asbestos-related harm in no way gives it exclusive authority to bring collections actions or in any way sort of precludes these basic breach of contract actions that parties naturally have under a contract when another member of the contract breaches and causes them harm. Judge Sirico, we were speaking before about the permissiveness, the idea of may, and Mr. Rossman suggested that that is a repose of discretion for the CCR to decide whether it wants to sue or not. I'd suggest two things in response to Your Honors. First of all, the contract is very clear even when it wants to give the CCR exclusive discretion to decide something. So if you look at Section 4, Paragraph 1, the contract is clear that it gives the CCR exclusive authority and discretion. So the CCR gets to decide when it's going to settle a personal injury case, when it's going to litigate it, all those things. So the parties even knew how to make discretion, to give sole discretion to the CCR, and they didn't here in the collection action. And indeed, I think parties may have been reluctant to even enter into the agreement if they knew that there might not be any collection action on their behalf and they were just stuck paying the share of another member. Of course, the agreement here is that the parties would come together and follow this, as Mr. Rossman says, insanely complex formula, but it wasn't meant to protect parties that failed to abide by that formula and didn't pay according to that allocation. USG and Quigley are just seeking reimbursements of the amount for that formula. They're not seeking any specific additional contribution or indemnity in the context of any of those personal injury actions. They're just asking for reimbursement for the amounts they paid on G1's behalf. Would I be correct if I characterized this as a pooled arrangement? Can you say that as a pooled arrangement, Your Honor? A pooled funding arrangement. I think that's probably a reasonable characterization. What would happen, the CCR, I guess, is best described, as the bankruptcy court did, as a conduit or an agent. It is, you know, working with these personal injury cases, there were tens of thousands of them, deciding whether to litigate them, deciding whether to settle them, and then it would collect from the different members, according to this complicated formula, how much each member had to pay, however they resolved it. So they were a conduit passing the money back and forth. The CCR itself was never harmed. The idea that there was some derivative harm from the CCR is not correct, because, of course, the CCR, if there was a deficiency from G1, they would just collect from other parties to make sure money was passed over to the plaintiffs. So the CCR is never really harmed here that there could be any derivative action from. All right, Ms. Blomquist, thank you very much. Thank you, Your Honor. And we want to thank all counsel for a case that is well briefed and very well argued, and we'll take the matter under advisement.